**CORNING GLASS WORKS, Plaintiff,**

v.

**SUMITOMO ELECTRIC U.S.A., INC. and Sumitomo Electric Industries, Ltd., Defendants.**

**SUMITOMO ELECTRIC RESEARCH TRIANGLE, INC., Plaintiff,**

v.

**CORNING GLASS WORKS, Defendant.**

Nos. 84 Civ. 9155 (WCC), 85 Civ. 3156 (WCC).

United States District Court, S.D. New York.

Oct. 13, 1987.

As Amended Dec. 21, 1987.

Fish & Neave, New York City, for Corning Glass Works; Lars I. Kulleseid, W. Edward Bailey, Daniel M. Gantt, Thomas J. Vetter, Alfred L. Michaelsen, K. McNeill Taylor, Jr., Corning Glass Works Patent Dept., Corning, N.Y., of counsel.

Cushman, Darby & Cushman, Washington, D.C., Research Triangle, Inc., Sumitomo Electric U.S.A., Inc. and Sumitomo Electric Industries, Ltd.; George T. Mobille, Chris Comuntzis, Richard P. Bauer, Duane M. Byers, Whitman & Ransom, New York City, of counsel.

## OPINION AND ORDER

### WILLIAM C. CONNER, District Judge: *

These are two consolidated civil actions involving issues of infringement and validity of three patents relating to optical waveguides of the type now widely used for telecommunications, such as long-distance telephone transmissions. The actions were tried by the Court without a jury commencing June 1, 1987. This Opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R. Civ.P.

### NATURE OF THE ACTION AND THE PARTIES

In these two actions, Corning Glass Works ("Corning") charges infringement by Sumitomo Electric Research Triangle, Inc. ("SERT"), Sumitomo Electric U.S.A., Inc. ("SEUSA") and Sumitomo Electric Industries, Ltd. ("SEI") of U.S. patents 3,659,915 ("the '915 patent"), 3,884,550 ("the '550 patent") and 3,933,454 ("the '454 patent"). The '915 and '550 patents are product patents covering the structure and composition of optical waveguide fibers. The '454 patent covers a process for producing such fibers.

* EDITOR'S NOTE: Judge Conner redacted portions of this opinion in order to omit confidential information. This redaction has, in some instances, resulted in incomplete sentences and

Corning, a New York corporation with its headquarters in Corning, New York, owns the three patents in suit as assignee of the inventors. SEI is a Japanese corporation engaged, *inter alia*, in the manufacture and sale of optical waveguide fiber. SERT and SEUSA are wholly-owned subsidiaries of SEI. SERT, a North Carolina corporation having its principal place of business at Research Triangle Park, North Carolina, also manufactures and sells optical waveguide fiber. SEUSA, a New York corporation having its principal place of business in New York City, sells optical waveguide fiber manufactured by SEI and SERT. SERT, SEUSA and SEI are hereinafter referred to collectively as "Sumitomo."

The first complaint in these consolidated actions was filed by SERT on August 16, 1984 in the United States District Court for the Middle District of North Carolina. On April 19, 1985, that action was transferred to this District. By stipulation, SEI has been added as a plaintiff in that action. That complaint sought, *inter alia*, a declaratory judgment that Corning's '915 and '454 patents are invalid, unenforceable and not infringed by SERT. In its answer, Corning counterclaimed for willful infringement of those patents by SERT.

On December 19, 1984, Corning filed in this Court the second complaint in these actions, seeking damages and an injunction against SEUSA and SEI for their allegedly willful infringement of the '915, '550 and '454 patents.

Five different types of optical waveguide fibers made, used or sold by Sumitomo in the United States are in issue in this litigation. Three of these are single-mode optical waveguide fibers—designated S-1 (known as type D within Sumitomo), S-2 (type D' within Sumitomo) and S-3 (type Z within Sumitomo)—and two are multimode graded-index fibers—designated M-1 (type A within Sumitomo) and M-2 (type C' within Sumitomo). Each of these includes a core of circular cross-section and an outer

in gaps in the text. These points in the opinion are indicated by triple asterisks within brackets [* * *].

cladding, both formed of fused silica, with the refractive index difference between the core and cladding controlled through the addition of dopant material to the core and/or the cladding. SEI's type S–1, S–2, S–3, M–1 and M–2 fibers are manufactured by SEI at its plant in Yokohama, Japan and exported to the United States. SERT has made types S–2, S–3 and M–2 optical waveguide fiber at its plant in Research Triangle Park, North Carolina. SEUSA sells all of these fibers in the United States.

## CORNING'S '915 PATENT

Corning's '915 patent, entitled "Fused Silica Optical Waveguide," was issued May 2, 1972 on an application filed May 11, 1970 by Drs. Robert D. Maurer and Peter C. Schultz. It contains eight claims; however, only claims 1 and 2 are asserted in these actions.

### Background of the Invention

Light is a form of electromagnetic radiation, a narrow segment of the continuum extending from radio waves at the low-frequency (long wavelength) end of the electromagnetic spectrum through gamma rays near the upper end. Only those light waves in the even narrower wavelength range from about 400 nanometers (0.4 microns) to about 750 nanometers (0.75 microns) are visible to the eye. Although visible light propagates through air with very little loss, in transparent solids like glass, it is transmitted with less efficiency than invisible infrared radiation in the range of about 750 to 1600 nanometers (0.75 to 1.6 microns). In silica glass, for example, there are two infrared wavelength "windows," centered at 1300 and 1550 nanometers, in which the attenuation or loss in transmission is particularly low. These wavelengths are accordingly used for transmission through silica, as in the optical fibers with which we are here concerned.

It has long been known that light can be guided through any transparent medium which is surrounded by another medium of lower refractive index, i.e., that light will follow the path of the medium of higher refractive index. Because air has a lower refractive index than glass, an unclad glass fiber surrounded by air will act as a conduit for light waves. However, such "air-clad" glass fibers are very inefficient as optical waveguides because scratches, imperfections or foreign materials on the surface of the fiber cause the light to be scattered instead of being refracted properly into the fiber. Thus, in the 1950s, the idea emerged of cladding an optical glass fiber with a different glass having a lower index of refraction. These early glass-clad, glass-core fibers were generally referred to as "fiber optics."

Such an optical fiber acts as a waveguide for light because light rays that enter the cladding from the core at less than a critical angle relative to the axis of the fiber are refracted back into the core and thus "bounce" back and forth in a zig-zag, somewhat sinusoidal path along the length of the fiber. Light rays which enter the cladding at angles greater than the critical angle pass through the cladding and are lost.

If the diameter of the core is sufficiently large (e.g., ten or more times the wavelength of the light being transmitted), light rays may enter the core over a fairly wide range of angles and still be propagated along the fiber provided, of course, they enter at less than the critical angle. Those rays or "modes" entering at shallower angles relative to the axis of the fiber will "bounce" back and forth across the core fewer times than those which are at steeper angles and thus will arrive sooner at the receiving end of the fiber. If the fiber is being used to transmit information, for example in the form of binary data pulses, this difference in transit times will cause the pulses to be dispersed or blurred at the receiving end. It follows that restricting the number of modes in the transmitted light increases intelligibility of the information transmission, the optimum being achieved when only a single mode is transmitted. This is accomplished by limiting the diameter of the core and carefully controlling the differential between the refractive indices of the core and cladding.

The critical angle, conventionally expressed as the "numerical aperture," of an optical waveguide fiber depends not only upon the diameter of the core but also its refractive index, which in turn depends upon its composition. The light rays or "modes" which enter the core at less than the critical angle and are refracted back from cladding into the core and thus proceed along the core, penetrate only the innermost portion of the cladding at each "bounce" or refraction so that 90 to 95 per cent of their travel path is in the core. In most optical waveguide fibers, the composition of the cladding, and consequently its index of refraction, are constant throughout the thickness of the cladding. This is not necessarily true of the core of multimode fibers in which the core is of relatively large diameter in relation to the wavelength of light being transmitted. In such fibers, the core may advantageously be made with an index of refraction varying across its diameter, being highest at the center of the core and decreasing gradually toward the outer surface. Such fibers are called "graded-index" optical waveguides.

Prior to 1970, optical fibers had been used to transmit light for illumination or as elements of an optical image, *e.g.*, in endoscopic probes. Such conventional optical fibers or "fiber optics" were capable of transmitting light of practical intensity only for very short distances, such as several meters, because of the poor transmission efficiency (high attenuation) of the fibers then available.

Optical waveguide fibers and conventional optical fibers are designed very differently. In conventional optical fibers used for illumination, the diameter of the core is very large, relatively, to increase the amount of light captured from the input light source, and the refractive index difference between the core and the cladding is very great to confine most of the light energy to the core. The light transmission efficiency of the cladding is therefore relatively unimportant. In contrast, in an optical waveguide fiber, the core must be of relatively much smaller diameter, for example, only on the order of five to ten microns for single-mode transmission.

Also, in an optical waveguide fiber, since a greater portion of the light path is through the cladding, the transmission efficiency of the cladding is very important.

In use, a light source, either a laser or a light emitting diode, is coupled with the optical waveguide fiber so that the light generated in response to an electrical signal is directed into the core at the transmitting end. The light which travels along the fiber is captured by a detector at the receiving end, which converts it back to an electrical signal. When optical waveguide fibers are used for telephone communications, for example, a single optical waveguide fiber of an overall diameter of 125 microns (5 one-thousandths of an inch) can carry over 1,000 simultaneous voice transmissions and can replace a conventional copper cable of a diameter of greater than 5 centimeters (2 inches).

In the early conventional fiber optics, mixed silicate glasses—typically containing 50% to 70% silica, along with other oxides—were generally used, although non-silicate glasses, such as germanate glasses, were also tried. Most of these glasses could be worked at temperatures of 1500°C. or lower and were well suited for drawing into fibers. Their high attenuation, however, made them hopelessly unsuitable for use in a lightwave communication system.

Attenuation, or light loss, is expressed in units of decibels per kilometer (dB/km). Decibels are computed on a logarithmic scale, as 10 times the power to the base 10 of the ratio between the input and output light energy. Typical attenuations for these conventional fiber optics were on the order of 1000 decibels per kilometer (1000 dB/km). This means that over a distance of one kilometer, the input energy would be ten to the one hundredth power times as great as the output energy.

Dr. Theodore Maiman, while working at the Hughes Research Laboratories, developed the first practical laser in 1960. The laser generates monochromatic, coherent light, with all of the energy at one precise wavelength, and with all of the lightwaves in phase. This energy can be almost per-

fectly focused to a fine spot the size of the wavelength of the light. The light can be propagated in an almost parallel beam, with very little dispersion. The invention of the laser sparked interest in lightwave communication systems as an ideal source of light for information transmission. Still, the attenuation of the fiber optics then available was many trillions of times too great for practical application.

By the mid–1960s, efforts were under way around the world to develop a long-distance lightwave transmission capability. This effort was backed in part by the British Post Office, whose goal was an optical waveguide with an attenuation of 20 dB/km, meaning that over a distance of one kilometer, it must deliver at the receiving end at least one percent of the input light energy—the approximate transmission efficiency of the copper wire commonly used in telephone communications. In January 1966, Mr. Stewart Miller of Bell Laboratories wrote: "Today there are probably more physicists and engineers working on the problem of adapting the laser for use in communication than on any other single project in the field of laser applications." At Bell Laboratories, about 50 engineers and physicists were involved in laser research, and 6 to 10 were involved in research on transmission media.

Dr. Charles Kao of ITT's Standard Telecommunications Laboratories ("STL") in England, began working on optical communications in about 1963, as did Thompson CSF in France. In July 1966, Kao and Hockham of STL published a paper discussing the feasibility of a long-distance optical waveguide fiber. The paper identified some of the problems to be overcome in attaining a practical optical waveguide fiber, e.g., absorption losses due to impurities such as iron in the glass and scattering losses caused by core/cladding interface imperfections. However, this paper offered no practical solutions to the problems it posed.

Subsequently, a number of companies conducted research in an attempt to overcome the problems identified in that article. This was done under the sponsorship of the British Post Office and included companies such as Barr and Stroud, Pilkington Brothers (a major glass-making company in England), and British Titan Products.

In November 1970, STL was still carrying out work on the use of double-crucible techniques for melting sodium silicate glasses for the production of optical waveguides. However, the results were far from successful. The minutes of the British Low Loss Optical Fiber Committee Meeting of February 24, 1971 state that "the fiber work seems sadly to have stuck at a loss of about 100 dB/km with the exception of the Corning work."

Bell Laboratories meanwhile was working on other types of light-transmitting media including a gaseous lens system. In this system, light was transmitted down a hollow tube filled with an inert gas. Heating the wall of the tube caused a radial temperature gradient, correspondingly altering the refractive index of the gas to form a converging lens. An experimental test of the system was carried out over a length of about 100 meters with these gaseous lenses spaced about one meter apart. Bell also experimented with hard lenses mounted inside a gas-tight pipe and aligned by servo-mechanisms. This system was tested in an underground conduit system over a distance of approximately one-third mile. These systems of light-focusing gas and glass lenses worked, but were too costly and difficult to maintain for practical application.

Bell Laboratories also did work on optical fiber waveguides, because it was clear that a glass fiber waveguide would be the practical ideal if the losses could be reduced sufficiently. Bell contacted glass companies, including American Optical and Bausch & Lomb and asked if they were willing to collaborate in an effort to make acceptable glass fibers, but both declined. In the mid–1960s, Bell obtained some sample glass fibers from a third company, De-Belle & Richardson. These fibers were made of multicomponent glass and had high attenuations, so Bell set up its own program to attempt to make acceptable glass fibers.

During the 1960s, Sumitomo also engaged in research on gas lens systems and on liquid cores for optical waveguide fibers. Dr. Kapany of Sumitomo was simultaneously engaged in research on glass-clad glass-core optical waveguides and by 1970 had produced fibers with attenuations in the range of hundreds of decibels per kilometer (with losses at least a hundred thousand times as great as the goal of 20 dB/km). Efforts to reduce the attenuation of these fibers were unsuccessful. By late 1970, the 20dB/km standard appeared remote and perhaps impossible to attain.

*The Invention of the '915 Patent*

Corning's work on optical waveguides began in 1966, when it was contacted by the British Post Office. Responsibility for the basic research fell to Dr. Maurer, who decided to investigate the properties of and to evaluate various Corning glasses for possible waveguide use. At the time, Corning manufactured, among many other glasses, a pure fused silica ($SiO_2$) glass. This glass was made by a flame hydrolysis process such as is described in Hyde U.S. patent 2,272,342. Corning also manufactured a silica glass doped with about 7% by weight of titania ($TiO_2$). This glass, disclosed in Nordberg U.S. patent 2,326,059, had a very low thermal expansion coefficient and was used for structural applications such as reflecting telescope mirrors, where superior dimensional stability was required, but not for light transmission.

Dr. Maurer was initially skeptical about the possibility of pure silica and titania-doped silica glasses for use in optical waveguide fibers for a number of reasons, including the fact that they required higher working temperature than conventional silicate glasses then in use in fiber optics (2000°C. v. 1000°C.). There was also little knowledge of their optical properties, such as light scattering and absorption. Moreover, the use of doped silica seemed contraindicated because doping fused silica would have been expected to increase its attenuation to an unacceptable degree. Indeed, in view of the Kao and Hockham paper teaching the need to reduce impurities in glasses such as fused silica to one

part per million, the deliberate addition of thousands of parts per million of a dopant material to pure fused silica would have appeared counterproductive.

Despite these negative indications, Dr. Maurer on March 1, 1967 directed the making and testing of a fiber with a titania-doped fused silica core and a pure fused silica cladding. During 1967, two such fibers were made by the rod-in-tube method, in which a rod of titania-doped fused silica glass was placed inside a tube of pure fused silica cladding glass for drawing into a fiber. Dr. Schultz joined Corning in August 1967, and shortly thereafter became involved in Corning's optical waveguide fiber research. He was principally responsible for identifying possible doped fused silica glasses, containing both titania and other dopants, and the fabrication of optical waveguide fiber preforms containing such doped silica glasses. He also co-developed a method of making such fibers by flame hydrolysis deposition of doped fused silica "soot" on the inside of a pure fused silica tube, which was subsequently drawn into an optical waveguide fiber in which the doped silica soot was sintered to form the core, and the pure fused silica tube formed the cladding.

In February 1967, Dr. Schultz attempted to produce an optical waveguide fiber by depositing flame hydrolysis-produced pure fused silica soot on the outer surface of a titania-doped fused silica core rod. This effort continued until April 1968, when he attempted to coat the inner surface of a pure fused silica tube with a titania-doped fused silica soot produced by flame hydrolysis. Work with these materials continued, and, on August 1, 1968, a titania-doped fused silica fiber drawn from a preform produced by Dr. Schultz was measured to have an attenuation of approximately 250 dB/km. This marked the production of the first doped fused silica optical waveguide fiber with losses sufficiently low for short-range communication uses and constituted an actual reduction to practice of the invention of the '915 patent.

Throughout the following year and a half, Corning experienced steady and sig-

nificant improvement, leading to the fabrication by early 1970 of the world's first 20 dB/km optical waveguide fiber—a fiber with a pure fused silica cladding and a doped fused silica core containing approximately 3% by weight titania. On May 11, 1970, the application was filed for the '915 patent on the invention of a silica-based optical waveguide fiber containing fused silica to which a dopant had been added.

In the fall of 1970, Dr. Maurer took one of these fibers to Bell Laboratories and asked Bell to confirm Corning's loss measurements. Bell Laboratories did so and determined the loss to be about 16 or 17 dB per kilometer. Bell Laboratories considered Corning's achievement an important breakthrough which made long-distance optical telecommunications possible. Corning did not tell Bell how the fibers had been made and Bell and others were unable to duplicate them.

Dr. Maurer first publicly reported the achievement of a 20 dB/km optical waveguide fiber, the goal originally set by the British Post Office, at the Conference on Trunk Telecommunications by Guided Waves, held in London, England, from September 29 to October 2, 1970. This announcement created enormous interest and was the subject of many articles in both technical publications and general interest media.

For example, the July 5, 1971 issue of *Electronics* carried an article entitled "Fiber Optics Sharpens Focus on Laser Communications," stating (at p. 47):

As recently as last fall, attenuation all but eliminated fiber optics from consideration as a transmission medium. Writing in the proceedings of the IEEE last October, Nilo Lindgren of Technology Communication Inc., New York, asserted: "At the present time, the glass used in fiber optics is very lossy, amounting to a decibel per meter at the very best. In actuality, with present glasses, the losses would amount to thousands of decibels per mile, which makes the material clearly unsuitable for long-distance transmission."

But by the next month, Robert D. Maurer, manager of the Applied Physics Research Group at Corning Glass Works, Corning, New York, reported two 30–meter sections of fiber optic waveguide with a total attenuation of 20 dB/km at the 6,328–angstrom wavelength. Several fibers were loaned to researchers at the British Post Office, London, and supplied to Bell Laboratories, Murray Hill, New Jersey. They confirmed Maurer's measurements.

This was the breakthrough many communications systems designers were waiting for.

Another article, entitled "Communicating on a Beam of Light," published in the March 1973 issue of *Fortune*, reported the development as follows:

A few laboratories here and abroad maintained an interest in trying to improve the fibers, but for five years the movement was so slow and the required degree of perfection so elusive that the task seemed hopeless.

*Breaching the 20–decibel barrier*

Late in 1970, Corning Glass announced the laboratory development of an optical fiber in which the light loss was reduced to 20 decibels per kilometer or less. At this critical level glass fibers could begin to be considered competitive with metal wires, cables, and microwave relay.

Similar articles appeared in other publications, including the November 1973 issue of *The Radio and Television Engineer.* Dr. Kapany, who is commonly referred to as the "father of fiber optics," and who testified at the trial as an expert for Sumitomo, acknowledged that Drs. Maurer and Schultz provided the first optical waveguide fiber that was practical for use in long-distance communications, and that this was a step forward in the art which made possible something commercially desirable that had been unattainable theretofore.

The invention caused many prestigious awards and honors to be accorded the inventors: In 1976, Dr. Maurer received the George W. Morey Award of the American Ceramic Society. In 1977, Dr. Schultz was the recipient of the first International

Glass Science Weyl Award. Dr. Maurer was awarded the Prize for Industrial Physics of the American Institute of Physics and the Morris N. Liebmann Award of the Institute of Electrical and Electronic Engineers both in 1978. Dr. Maurer was also awarded the L.M. Ericsson International Prize for Telecommunications in 1979. Dr. Schultz was a recipient of the 1981 International Society for Optical Engineering Technology Achievement Award. In addition, Drs. Maurer and Schultz were co-recipients in 1983 of the Engineering Materials Achievement Award of the American Society for Metals. In 1986, Dr. Maurer was the recipient of the I.R.I. Achievement Award, bestowed by the Industrial Research Institute for his "contributions to the understanding and discovery of materials and techniques for the fabrication of glass-fiber waveguides for optical communications." The citation went on to state:

> In less than four years from the start of the research, he was able to produce fiber with optical losses low enough to be considered acceptable for wide use in telecommunications. This pioneering research made possible the optical communications revolution.

And, early this year, Dr. Maurer became the first recipient of the John Tyndall Award of the Lasers and Electro-Optics Society of IEEE and the Optical Society of America.

The invention of the '915 patent has achieved impressive commercial success, literally creating a worldwide multimillion dollar optical waveguide fiber industry. By 1986, Corning's own annual sales of such fibers had grown to over [* * *] kilometers.

The respect accorded this basic invention is further reflected by the number of licensees under the '915 patent and its foreign counterparts. These licensees include, for example, ITT (now CIT Alcatel), SpecTran Corporation and Northern Telecom. Through the end of 1986, Corning has received in excess of [* * *] in royalties and other payments on its optical waveguide fiber patents. [* * *] by ITT, in settlement of litigation.

The United States Government, after litigation, entered into an agreement with Corning setting a rate of compensation to be paid to Corning for the Government's procurement and/or use of optical waveguide fiber covered by Corning patents, including the '915 patent. The initial compensation rate is 6.5%, declining to 5%. The Government paid $650,000 when the agreement was signed in 1983.

After two years of litigation, another manufacturer of optical waveguide fiber and cable, Valtec, consented in 1984 to entry of a judgment that the '915 patent is valid, enforceable, and has been infringed by Valtec.

Finally, the '915 patent was held valid and infringed by Sumitomo optical waveguide fiber, in a proceeding before the United States International Trade Commission. The '915 patent was found to be a pioneer patent. The '915 patent clearly covers a basic, pioneering invention.

*The '915 Patent and its Disclosure*

The '915 patent discloses a "fused silica optical waveguide" fiber capable of limiting the transmitted light to preselected modes for use in optical communication systems, specifically a fiber having a fused silica core and a fused silica cladding, to either or both of which a dopant or dopants have been added to make the index of refraction of the core greater than that of the cladding by a predetermined percentage.

Fused silica is made by the process disclosed in Hyde U.S. patent 2,272,342 to yield a vitreous silica containing no impurities in an amount greater than 0.1% by weight except for hydrogen-oxygen groups, which may be present in amounts up to 5% by weight. The dopant or dopants which are intentionally added are not considered impurities.

Prior to the filing date of the application for the '915 patent, the inventors had only experimented with dopant materials which increased the refractive index of fused silica. Thus, the specification of the '915 patent only specifically mentioned such dopant materials, although the concept of the invention is clearly broad enough to include

the use of dopants which decrease the index of refraction of silica to achieve the necessary differential between core and cladding. The inventors simply did not know of specific dopants that would decrease the refractive index of fused silica at the time the application was filed.

It has been known in the art at least since 1954 that the introduction of fluorine decreases the index of refraction of certain multicomponent glasses. No teaching in the specification of the '915 patent excludes the use in the cladding of dopant materials which negatively alter the refractive index of fused silica. Nor is there any suggestion in the specification that such dopant materials would not perform substantially the same function, in substantially the same way, to obtain the same result of a precise refractive index difference between core and cladding as that obtained through the use of dopant materials which positively alter the refractive index of the core.

The '915 patent discusses two methods by which doped fused silica optical waveguide fibers can be made, namely, the rod-in-tube method and the inside vapor deposition method described in U.S. patent 3,711,-262, which is specifically incorporated by reference in the '915 patent. Flame hydrolysis is one inside vapor deposition method described in U.S. patent 3,711,262. The flame hydrolysis method for making optical waveguide fiber described in the specific examples of the '915 patent and U.S. patent 3,711,262 is the method utilized by the inventors for reducing to practice the invention of the '915 patent and for the subsequent production of optical waveguide fibers with even lower loss. The '915 patent contains teachings adequate to enable one of ordinary skill in the art to produce a doped fused silica optical waveguide fiber, as was recognized by Sumitomo's reference to the '915 patent at column 1, lines 16 through 20, of its own U.S. patent 3,877,-912, filed October 9, 1973. Prior to May 1970, Corning also made fibers containing alumina-doped fused silica and zirconia-doped fused silica, but the results were not as good as those achieved with titania.

The first fiber with which the inventions had achieved a 20 dB/km loss contained approximately 3% by weight titania in the core. However, they had encountered difficulties with the 3% titania core composition, because of variations in composition inherent in the production process. Attempts to dope with such low concentrations of titania sometimes led to a failure to obtain sufficient dopant in the fused silica core to create the refractive index differential necessary for the fiber to function as a waveguide.

Corning's most consistent and reproducible results in the production of optical waveguide fibers prior to May 1970 were achieved primarily with a core of fused silica doped with 5.25% titania. In teaching others how to practice their invention, the inventors believed that it was best to disclose this most consistently performing formulation as the preferred embodiment.

The specification of the '915 patent lists examples of materials which the inventors believed to be suitable dopants. The examples specifically identified include titanium oxide, tantalum oxide, tin oxide, niobium oxide, zirconium oxide, ytterbium oxide, lanthanum oxide, aluminum oxide, cesium and rubidium. That this listing was not intended to be exclusive is apparent from the use of language such as that appearing at lines 23 and 24 of Column 4: "Suitable dopants having minimum diffusion properties include, for example...."

The materials specifically listed in column 4 included all those actually used by the inventors prior to the filing of the application for the '915 patent. Much of the work of Dr. Schultz prior to 1970, in addition to that directed specifically to the making of optical waveguide fibers, involved the exploration of glass systems based on fused silica. This work involved the making of fused silica glasses with various dopants and the analysis and testing of the glasses formed. This work, combined with the experience gained in the making of optical waveguide fibers, formed the basis for the selection of the materials specifically listed in the '915 patent. All of the suggested dopant materials listed in

column 4 of the '915 patent are suitable for use in optical waveguide fibers. Germanium oxide, or germania ($GeO_2$) is not expressly mentioned as a dopant in column 4 of the '915 patent, only because it had not been tested prior to the filing date of the application for the '915 patent. Dr. Schultz had produced a germania-doped fused silica in bulk form by a direct vitrification process, in which the germania-silica soot was deposited into a highly heated furnace, causing the germania to volatilize. Thus only a small amount of germania (less than one tenth of one percent by weight) remained in the silica—an amount too small to alter the refractive index of fused silica sufficiently to serve as the core of an optical waveguide fiber with a pure fused silica cladding.

Germania is a dopant material which positively alters the refractive index of fused silica without unacceptable absorption or scattering of light. The '915 patent and U.S. patent 3,711,262, incorporated by reference therein, teach the deposition of doped fused silica into an unheated tube at room temperature, followed by a sintering step at temperatures below those at which germania will volatilize. The '915 patent and U.S. patent 3,711,262 therefore teach a method for practical production of a fused silica doped with useful amounts of germania. Thus, if either the specific example of the '915 patent, at column 4, line 60 through column 5, line 7, or the specific example of the incorporated U.S. patent 3,711,262, at column 7, lines 16 through 54, were followed, substituting germania for the titania used in each, each would produce a usable optical waveguide fiber. Indeed, in 1972, when Dr. Schultz first began experimenting with the preparation of silica fibers doped with germania, such fibers demonstrated their usefulness as optical waveguides. And, by mid–1972, a doped fused silica optical waveguide fiber containing approximately 9% germania by weight in the core had been made with an attenuation of only 4 dB/km. Germania is a dopant material within the scope of the '915 patent, as is germania in combination with phosphorus pentoxide.

With regard to the amount of dopant to be used with fused silica in an optical waveguide fiber, the '915 patent specification states that:

> To make certain that doped fused silica possesses optical and physical characteristics almost identical to those of pure fused silica, doping materials should not exceed 15 percent by weight.

The patent does not teach that an optical fiber containing more than 15% by weight of dopant material will not function as a waveguide, but only that there are advantages to be gained from limiting dopant levels to 15% or lower. That teaching was based upon the experimental observations of the inventors and was intended to assist in obtaining optimum results.

Prior to the filing date of the application for the '915 patent, the inventors had produced no commercially useful fiber containing more than 15% by weight of dopant material. Only one fiber with more than 15% by weight of dopant had been made—a fused silica fiber doped with approximately 37% by weight of alumina ($Al_2O_3$). While this fiber did exhibit single-mode light transmission, its loss was measured to be approximately 450 dB/km, far worse than the attenuation of the fiber by which the invention was first reduced to practice in August 1968. Moreover, work performed by Dr. Schultz on bulk alumina-doped silica glasses suggested that glass containing high amounts of alumina would not be useful for optical waveguide applications.

This was consistent with the thinking in the art at the time. U.K. patent application 2,029,400, filed in 1979 by SEI and Nippon Telegraph and Telephone Public Corporation and listing SEI employee Hoshikawa as a co-inventor, discusses the advantages of maintaining germania dopant levels below about 15% by weight. For example, page 1, lines 75 through 78, states that:

> Since scattering loss increases in proportion to the amount of the additives, the amount of additives such as $GeO_2$, $P_2O_5$ and $B_2O_3$ in the core must be small in order to reduce scattering loss.

It is also noted on page 1, at lines 98 through 100, that too high an amount of

germania in the core leads to a narrower transmission bandwidth. Moreover, SEI notes on page 2, lines 12 through 30, that high concentrations of germania increase the probability of generating bubbles in the fiber during drawing:

> Various experiments have shown, $GeO_2$ amount should be less than 15wt%, in order to ensure that the generation of bubbles is negligible and low transmission loss is obtained.

## The Prosecution of the '915 Patent

During the prosecution of the application for the '915 patent, the examiner cited three references, Flam et al. U.S. patent 3,542,536, Koester et al. U.S. patent 3,445,-785 and Seitz U.S. patent 3,553,013. Only the Flam patent was applied against the '915 application. During prosecution, Corning distinguished the invention of the '915 patent from the Flam optical waveguide, wherein the refractive index of the base material is altered by neutron irradiation, which causes structural dislocation of the atoms or molecules of the base material. Corning contrasted the invention of the '915 patent as "chemical doping."

Allowance of the claims of the '915 patent followed two telephone interviews between the examiner and Corning's patent attorney. As a result of those interviews, two changes were made in claim 1. The first, which appears in two places in the claim, calls for the doped fused silica to be "fused silica to which a dopant material on at least an elemental basis has been added." This change, specifying that a chemical material in a form no smaller than an element be added to the fused silica base material, was made to distinguish the Flam patent, which discloses irradiation by subatomic particles.

The second change made to claim 1 was to add a limitation on the amount of dopant material in the core to no more than 15% by weight. Why this addition came to be made is unclear because it is not called for by the examiner's prior arguments for rejection, to wit, that the Flam patent disclosed an optical waveguide formed by "doping" by irradiation. There is no indication in the prosecution history of the '915 patent that Corning in any way represented the 15% limitation in claim 1 to be critical.

## The Art Relied Upon By Sumitomo

### (1) The United Kingdom '101 Patent

U.S. Patent Specification 1,113,101 (the "U.K. '101 patent"), published May 8, 1968, discloses luminescent glasses. It does not disclose or suggest an optical waveguide.

Photoluminescent fibers made in accordance with the U.K. '101 patent would absorb radiation and convert the energy to luminescence. Of course, light absorption by the core is precisely what must be avoided in an optical waveguide fiber. However, Sumitomo contends that the fibers of the U.K. '101 patent do not absorb visible light but ultraviolet radiation, and therefore would be capable of light transmission. However, there is no evidence establishing the attenuation of such fibers. Sumitomo attempts to minimize the significance of the fact that luminescence was the prime object of the U.K. '101 patent by pointing out that the glass of the '915 patent will also luminesce if excited at certain wavelengths. But these wavelengths are well outside the range of the light being transmitted.

Although the U.K. '101 patent teaches that luminescent fibers made in accordance with the patent may be enclosed within a sheath of fused silica, the patent does not teach the use of a dopant for the purpose of creating a controlled refractive index differential between core and cladding. Sumitomo asserts that the inclusion of 5–5000 parts per million of rare earth elements in silica glass, as taught by the U.K. '101 patent would in fact produce sufficient refractive index differential to cause the fiber to function as an optical waveguide. However, this was in no way suggested by the patent, and was entirely foreign to, and possibly inconsistent with, its objective of a luminescent fiber.

Sumitomo further contends that the structural elements set forth in claim 26 of the U.K. '101 patent are identical with those recited in claim 1 of the '915 patent,

which Sumitomo argues Corning effectively admitted when it disclaimed the structure of claim 26 in order to obtain allowance of Corning's U.K. application corresponding to the '915 patent. Thus, Sumitomo reasons, the '915 invention constitutes nothing more than the discovery of a new use for an old product. But there is no persuasive evidence that any fiber disclosed by the U.K. '101 patent has ever been or could be used for practical telecommunications. Despite claim 26, the U.K. '101 patent did not teach the art the solution to the problem which was solved by the '915 invention, nor was it even addressed to that problem.

### (2) The Kao Paper

The article "Dielectric–Fibre Surface Waveguides for Optical Frequencies," by Kao and Hockham (the "Kao paper"), published in July 1966 in the Proceedings of the IEEE, Vol. 113, No. 7, suggested a dielectric fiber with a refractive index higher than its surroundings as a possible medium for optical communication.

The Kao paper teaches that the light losses in a dielectric waveguide fiber are caused by absorption and scattering in the fiber and the surrounding medium, and that such losses must be low. Although the Kao paper concluded that cladded glass fibers were possibly usable as optical waveguides, it expressly recognized that the feasibility of waveguides depended on the availability of suitable low-loss materials, and that this was a "crucial" and "difficult" materials problem which was yet to be solved.

### (3) The Flam Patent

Flam et al. U.S. patent 3,542,536 (the "Flam patent") for a "Method of Forming Optical Waveguide by Irradiation of Dielectric Material," issued November 24, 1970, on an application filed September 1, 1967 was cited and considered by the examiner during the prosecution of the '915 patent. The effective date of the Flam patent as a reference is September 1, 1967, subsequent to the date of conception of the '915 patent.

Flam relates to a method of fabricating an optical waveguide by irradiating a block of a solid dielectric material, such as silica, with a beam of protons to change the distribution of silicon and oxygen and thereby form a region with a different refractive index. This in no way suggests the invention of the '915 patent in which a dopant—a physical substance—is added to fused silica to alter its refractive index.

There is no evidence which suggests that the method of the Flam patent could be used in fabrication of practical optical waveguides kilometers in length.

### (4) The Nordberg Patent

Nordberg U.S. patent 2,326,059 (the "Nordberg patent") for "Glass Having an Expansion Coefficient Lower Than That of Silica," was issued on August 3, 1943, on an application filed April 22, 1939. Nordberg disclosed glasses having low expansion coefficients and had as its primary object the provision of a glass having a coefficient of expansion less than that of fused silica. Another object was to produce an "opal" (non-transparent) glass.

The Nordberg patent was disclosed to the U.S. Patent Office by Corning in connection with the prosecution of the '915 patent. The '915 patent, in column 4, lines 4–12 specifically incorporates by reference the copending U.S. patent application Serial No. 36,267, which later issued as U.S. patent 3,711,262. The Nordberg patent is referred to at column 5, lines 60–65 of U.S. patent 3,711,262.

Nordberg does not relate to optical waveguides nor to any other kind of fiber. It merely discloses titania-doped fused silica and the method of making such a glass, for use as a structural material with a very low coefficient of expansion. There was no suggestion of any advantages in optical transmission.

A skilled art worker in the optical waveguide field in the late 1960s who read Nordberg's patent would be led away from using his material in optical waveguides because he stated that a secondary object of his invention was to produce an opal glass. The opacity of such glass results from scattering of light, which renders the glass unsuitable for light transmission, as taught in the Kao paper. While the Nordberg

patent teaches that titania-doped fused silica glass *may* be "transparent," the fact that it may also be opaque would cause one skilled in the art to question whether such glass possessed the virtually perfect transparency which the Kao paper taught was necessary for long-distance optical transmission.

### (5) *The Mattmuller Patent*

Mattmuller U.S. patent 3,334,982 (the "Mattmuller patent") for the "Manufacture of Silica Glass," was issued August 8, 1967, on an application filed January 30, 1962. It discloses a method for the manufacture of silica glass by the decomposition of silicon halide vapors in the flame of an oxyhydrogen blowpipe and the direct vitrification of the resulting silica.

The Mattmuller patent does not relate to or discuss optical fibers, nor does the patent indicate that the material produced by the process of the patent is at all usable for its optical properties. Although it was referred to in the invention disclosure prepared by Dr. Schultz for the invention of the '915 patent, the Mattmuller patent was referred only for its disclosure of the vapor deposition method.

A worker of ordinary skill in the optical waveguide field in the 1960s would have been discouraged from utilizing the fused silica glasses of the Mattmuller patent for an optical waveguide fiber because such materials were highly refractory, requiring extremely high temperatures for working. Although the Mattmuller patent speaks of achieving "transparent" glasses, it does not teach that it is possible to achieve the extremely high transparency necessary for long-distance telecommunications.

### (6) *The Hyde Patent*

Hyde U.S. patent 2,272,342 (the "Hyde patent") for a "Method of Making a Transparent Article of Silica," was issued February 10, 1942, on an application filed August 27, 1934. It had as its object the production of articles of fused silica at relatively low temperatures and, if desired, of a high degree of purity. It discloses the "flame hydrolysis" method for producing a "soot" which is sintered to form fused silica. It does not teach that this method can be used to form optical waveguides for long-distance telecommunications.

The Hyde patent was disclosed to the U.S. Patent Office by Corning in connection with the prosecution of the '915 patent. The '915 patent, in column 4, lines 4–12 specifically incorporates by reference copending U.S. patent application Serial No. 36,267, which later issued as U.S. patent 3,711,262. The Hyde patent was referred to at column 5, lines 60–64 of U.S. patent 3,711,262.

### (7) *The Koester Patent*

Koester U.S. patent 3,445,785 (the "Koester patent") for "Laser Systems and the Like Employing Solid Laser Components and Light–Absorbing Claddings," was issued May 20, 1969, on an application filed August 5, 1963. It relates to laser components comprising selectively absorbing claddings which assertedly provide enhanced laser operating efficiencies. It does not discuss optical fibers of any kind. Indeed, the highly absorbing dopants it discloses would be altogether unsuitable for use in optical waveguides.

The Koester patent was cited and considered by the examiner during the prosecution of the '915 patent.

### (8) *The Seitz Patent*

Seitz U.S. patent 3,533,013 (the "Seitz patent") for an "Optical Maser Having Means for Concentrating the Pumping Light Energy in the Central Portion Thereof," was issued October 6, 1970, on an application filed March 23, 1967. It discloses a laser design wherein a doped laser material is enclosed within an "exteriorly silvered generator," which focuses the laser pumping energy along the central laser axis. The patent does not relate to optical fibers of any kind.

The effective date of the Seitz patent as a reference is March 23, 1967, which is subsequent to the conception date of the '915 patent; nevertheless, the Seitz patent was cited and considered by the examiner during the prosecution of the '915 patent.

### (9) *The United Kingdom '535 Patent*

U.K. patent 1,160,535 (the "U.K. '535 patent") for "Dielectric Fibers" was published on August 6, 1969. It describes fiber optics formed of silicate glasses, *i.e.*, multicomponent glasses containing between 20% and 65% silica, together with numerous other materials; these materials are altogether different from doped fused silica. Moreover, the effective date of the U.K. '535 patent as a reference is August 6, 1969 which is subsequent to the dates of conception and actual reduction to practice of the invention of the '915 patent.

Fiber optic glasses of the type disclosed in the U.K. '535 patent were widely known as fiber materials; these were the "high quality optical glasses" referred to in the Kao paper as being among the "best transparent materials known," at that time. It was the high attenuation of such conventional fiber optics that forced those seeking a useful optical waveguide to search elsewhere.

(10) *The United Kingdom '509 Patent*

U.K. patent 1,108,509 ("the U.K. '509 patent") was published April 3, 1968. It describes multi-component germanate glasses containing 35–62% germania. Sumitomo does not assert that any such glasses could be used in optical waveguide fibers for effective telecommunications, but relies upon the U.K. '509 patent only as teaching the use of certain of the oxides referred to in the '915 patent specification as dopants to increase the refractive index of a fiber core.

However, the '915 patent does not claim doping *per se*, but the controlled doping of a pure fused silica glass to create the desired refractive index differential. The U.K. '509 patent teaches nothing about the doping of pure fused silica.

(11) *The Schultz patent*

Schultz U.S. Patent 3,320,114 (the "Schultz patent") for "method for Lowering Index of Refraction of Glass Surfaces" was issued May 16, 1967. It is directed to a method of making an optical fiber by treating the exterior of a silica fiber with a dopant which lowers the refractive index of the outer portion of the fiber.

Schultz's criterion of success was whether the fiber was capable of transmitting light at all. There is no evidence that any such fiber was ever tested to determine whether its attenuation was sufficiently low to permit its use for practical telecommunications, and no evidence suggesting that such a fiber could be so used. And, of course, the fibers of Schulz are structurally different from those with distinct core and cladding layers as called for in the '915 patent claims.

(12) *The United Kingdom '953 Patent*

United Kingdom patent 1,152,953 (the "U.K. '953 patent"), published May 21, 1969, discloses an optical fiber with a fused silica core and a synthetic plastic cladding of lower refractive index.

Again, there is no evidence that any such fiber could be used for practical telecommunications. And not only does it differ structurally from the silica-clad silica-core fiber claimed in the '915 patent, it actually teaches away from that construction, stating at page 1, lines 60–68:

It is also impossible to fuse on to a quartz glass core a glass of lower refractive index, firstly because a glass of sufficient low refractive index, apart from the fluorine glasses which are completely unsuitable for use for this purpose, formerly did not exist and secondly because the fusing would not be possible on account of the great difference in the coefficients of expansion.

(13) *Contract Proposal R10/37*

This contract proposal, authored by Dr. H.T. Roettgers and Dr. Kao of STL, was submitted to certain British Government groups in December 1967.

Sumitomo asserts that "between 50 and 100 persons had access to the document, all of whom were knowledgeable in the art." Apparently Sumitomo refers to the members of the Signals Research and Development Establishment of the British Government and to the Low Loss Optical Fibre Committee of the British Post Office. However, there is no evidence respecting the extent to which it was available to members of the general public. Sumito-

mo's statement that Corning must have been informed of the proposal because it had been in contact with the British Post Office since 1966 is pure speculation and such knowledge was denied by the Corning personnel who would have been informed about it.

In any event, the proposal is nothing more than a suggestion of research to be undertaken at STL in an attempt to develop a low-loss optical waveguide fiber. Although a coated fiber was one of three possibilities STL proposed to investigate, there was no disclosure of any specific fiber, but merely a suggestion that a quartz (silica) fiber might be coated with one of "a fair number of materials, namely fluorinated compounds whose refractive indexes can be considerably smaller than quartz."

The proposed project was apparently carried out by STL, but there is no evidence that STL succeeded in developing optical waveguide fibers capable of practical long-distance telecommunications.

\* \* \* \* \* \*

 person of ordinary skill in the optical waveguide field in the late 1960s was a person having a degree in materials science, ceramics, physics or a similar field and familiar with the concepts of light transmission, material scattering and turbidity and the effect of composition on refractive index. He was also familiar with the phenomenon of glass transition and with devitrification, phase separation and cooling stresses in glasses.

The invention claimed in claims 1 and 2 of the '915 patent was not obvious to such persons at the time in view of any of the patents or publications relied on by Sumitomo, considered singly or in any combination.

*Sumitomo's Other Affirmative Defenses*

*(1) Adequacy of Disclosure*

██] Sumitomo contends that the '915 patent is invalid because the specification fails to contain sufficient disclosure to enable one skilled in the art to practice the invention, as required by 35 U.S.C. § 112. Specifically Sumitomo asserts that there is

"no teaching in the '915 patent regarding structural parameters such as core diameter, refractive index difference or mode control of waveguides."

On the contrary, the patent specification at column 4 line 60 to column 5, line 7 gives a specific example of a waveguide having a core diameter of approximately 3 microns and an overall diameter of approximately 100 microns, with refractive indices of 1.466 for the core and 1.4584 for the cladding, and describes in detail an inside vapor deposition process of making such a fiber.

This disclosure was sufficient to permit one skilled in the art to practice the invention without undue experimentation. *See Minerals Separation Ltd. v. Hyde*, 242 U.S. 261, 270–71, 37 S.Ct. 82, 86, 61 L.Ed. 286 (1916); *Lindemann Maschinenfabrik v. American Hoist & Derrick*, 730 F.2d 1452, 1463 (Fed.Cir.1984).

*(2) Disclosure of Best Mode*

██ Sumitomo asserts that in Corning's experimental work prior to the filing of the application for the '915 patent, the only fiber ("1–94") which exhibited an attenuation below 20 dB/km contained only 3% titania dopant in the core, whereas fibers doped with 5.25% titania, as disclosed in the '915 patent, had an "attenuation of about 80 dB/km." Thus, Sumitomo urges, the '915 patent fails to satisfy the requirement of 35 U.S.C. § 112 that the inventors disclose the best mode known to them for the practice of the invention.

Sumitomo has ignored the results of other Corning tests indicating that the inventors were unable to duplicate the loss attenuation of fiber 1–94 with other fibers doped with 3% titania, but were able, with reasonable consistency, to achieve attenuations much lower than 80 dB/km with fibers doped with 5.25% titania by weight.

Their choice of the 5.25% doping level as the preferred example in the '915 patent specification was therefore reasonable in the circumstances. If the inventors had chosen a 3%–doped fiber instead, Sumitomo would doubtless be complaining that the example was based on a "freak" experiment which the inventors had never been

able to duplicate up to the time the application was filed.

The fact that up to that time the inventors had not achieved 20 dB/km attenuation with fibers doped with 5.25% titania is of no significance. The '915 patent does not discuss any specific attenuation level as characterizing the invention.

### (3) *Criticality of the 15% Doping Limit*

■ Sumitomo further contends that the '915 patent is invalid or unenforceable because the 15% limitation in the amount of dopant in the core, which was added to claim 1 by amendment, is not critical, as shown by the '550 patent issued to the same inventors.

It is undisputed that at the time the application for the '915 patent was filed, the inventors believed that fibers containing more than 15% dopant in the core were not practical as, indeed, they specifically stated at column 3, lines 56–59 of the specification.

The fact that this assumption later proved to be incorrect, at least insofar as germania dopant is concerned, does not invalidate the '915 patent or render it unenforceable. The patent does not teach that the 15% limitation is critical, and no such representation was made to the Patent Office during prosecution of the patent application, nor was the limitation relied on in distinguishing any prior art.

Claim 1 was patentable without the limitation, but nothing prevents inventors from claiming less than they were entitled to claim. In comparable circumstances, in *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1556 (Fed.Cir.1983), the Court of Appeals for the Federal Circuit stated:

> Garlock's appeal argument that the '390 claims are invalid because the recited minimum matrix tensile strengths are not "critical" is without merit. A claim to a new product is not legally required to include critical limitations. *In re Miller*, 441 F.2d 689, 169 USPQ 597, 602 (CCPA 1971). The '390 claims are not drawn to optimization of ingredients or ranges within broad prior art

teachings, but to new porous PTFE products of particular characteristics.

Corning is not attempting to recapture the coverage which was surrendered by this amendment by contending that the '915 patent is infringed by fibers containing more than 15% dopant by weight in the core. Sumitomo thus stands only to benefit from the unnecessary restriction of the '915 patent coverage.

### (4) *Disclosure of Pertinent Art*

Sumitomo further contends that the '915 patent is unenforceable because the inventors failed to disclose to the Patent Office pertinent prior art known to them, including the Nordberg, Hyde and Mattmuller U.S. patents, and a number of their own internal disclosure memoranda.

However, as previously mentioned, both Nordberg and Hyde were indirectly called to the attention of the Patent Office by being referred to in U.S. Patent 3,711,262, the application for which was incorporated by reference in the '915 patent. The remaining items of prior art which Sumitomo charges were withheld from the Patent Office are no more relevant than the art that was cited and considered by the Patent Office during prosecution of the application for the '915 patent.

### *Infringement by Sumitomo's Optical Waveguide Fibers*

Corning charges infringement of only Claims 1 and 2 of the '915 patent, which read as follows:

> 1. An optical waveguide comprising a cladding layer formed of a material selected from the group consisting of pure fused silica and fused silica to which a dopant material on at least an elemental basis has been added, and a core formed of fused silica to which a dopant material on at least an elemental basis has been added to a degree in excess of that of the cladding layer so that the index of refraction thereof is of a value greater than the index of refraction of said cladding layer, said core being formed of at least 85 percent by weight of fused silica and an effective amount up to 15 percent by weight of said dopant material.

2. The waveguide of claim 1 where the cladding layer is substantially fused silica.

The five types of Sumitomo optical waveguide fiber which are in issue in this litigation have the following compositions:

Fiber M-2 has a cladding of substantially pure fused silica, with a silica-based core containing in excess of 15% by weight dopant in its core. Corning therefore does not charge that it infringes the '915 patent.

Fiber M-1 has a cladding layer of substantially pure fused silica and a core predominantly of silica containing approximately 9.5–10% by weight germania and approximately 0.1% by weight phosphorus pentoxide. It includes each of the elements called for in claims 1 and 2 of the '915 patent.

Sumitomo's argument that germania and phosphorus pentoxide are not "dopant material[s]" within the scope of claims 1 and 2 because neither is disclosed in the specification of the '915 patent is not persuasive. At the time the application for the '915 patent was filed, both germania and phosphorus pentoxide were known to be dopants which increased the refractive index of silica, and it was known how to produce fibers containing such dopants by sintering and drawing a soot deposited by flame hydrolysis.

Fiber S-1 has a cladding layer of substantially pure fused silica. Its core is predominantly silica containing approximately 6% by weight germania. It includes each of the elements of claims 1 and 2 of the '915 patent. The foregoing discussion relative to the M-1 fiber is equally applicable to the S-1 fiber.

Fiber S-2 has a predominantly silica cladding layer containing approximately 0.2% by weight fluorine. Its core is predominantly silica containing approximately 5% by weight germania. Fluorine is a dopant material which negatively alters the refractive index of silica, but does not absorb or scatter light to any appreciable extent.

Fiber S-2 is an optical waveguide which includes each of the elements of claim 1 of the '915 patent. It has a cladding of fused silica to which dopant material on at least an elemental basis has been added. It also has a core of fused silica to which dopant material on at least an elemental basis has been added to a degree in excess of the dopant material of the cladding, said core dopant material having been added in an effective amount less than 15% by weight.

Fiber S-3 has a predominantly silica cladding layer containing approximately 1% by weight fluorine. Its core is substantially pure fused silica. The refractive index difference between the core and cladding of each of fibers S-1, S-2 and S-3 is approximately the same. As previously noted, fiber S-1 contains 6% by weight germania in the core and fiber S-2 contains 5% by weight germania in the core. The refractive index of the core of fiber S-2 is, therefore, slightly lower than the refractive index of the core of fiber S-1. Fiber S-1 has a pure fused silica cladding. To maintain the same core-cladding refractive index differential as in fiber S-1, the refractive index of the cladding of fiber S-2 must be lowered by approximately the same amount as the refractive index of core of fiber S-2 is below that of the core of fiber S-1. This is done by the addition of 0.2% by weight fluorine to the cladding of fiber S-2.

Fiber S-3 contains no germania or other dopant material in its core. The refractive index of the core of fiber S-3 is therefore still lower than the refractive index of the core of fiber S-2. To maintain the same core-cladding refractive index difference as that achieved in fiber S-2, the refractive index of the cladding of fiber S-3 must be lowered by approximately the same amount as the refractive index the core of fiber S-3 is below that of the core of fiber S-2. This is done by the addition of an additional 0.8% by weight fluorine to the cladding of fiber S-3.

Thus, Sumitomo maintains approximately the same refractive index difference between the core and cladding of each of its single-mode optical waveguide fibers by substituting fluorine (a dopant which negatively alters the index of refraction of fused silica) in the cladding for the germania (a dopant which positively alters the

index of refraction of fused silica) which is removed from the core. The use of fluorine as a dopant in the cladding thus performs substantially the same function in substantially the same way as the use of a germania dopant in the core to produce the same result of creating the refractive index differential between the core and cladding of the fiber which is necessary for the fiber to function as an optical waveguide.

Therefore, fibers S–1, S–2 and S–3 are functional equivalents. Although fiber S–3 is not within the literal language of either claim 1 or 2 of the '915 patent, it performs substantially the same function in substantially the same way to obtain the same result as the optical waveguide fiber described in those claims of the '915 patent.

Sumitomo contends that a fiber, such as S–3, with a pure fused silica core and a fluorine-doped cladding is not the equivalent of the fibers with doped cores, as described in claims 1 and 2 of the '915 patent, but has a number of advantages thereover, including greater physical strength and less susceptibility to degradation by hydrogen or high energy radiation.

Sumitomo's expert, Dr. Kapany, testified that pure fused silica core, fluorine-doped cladding fibers achieve a lower attenuation than germania-doped fibers. However, that opinion was based upon his mistaken belief that the best loss achieved in a fiber with a germania-doped core was .25 dB/km versus .154 dB/km for one with pure fused silica core and fluorine-doped cladding. However, in 1982 Corning announced a new "champion fiber" with a loss of .16 dB/km. It had a germania-doped core. This was, for all practical purposes, as good as the best pure fused silica core fiber ever announced. The loss of these fibers is less than 1% of the original goal of 20 dB/km.

Corning's commercial production of over germania-doped single-mode fibers (most of which are between 6 and 12.6 kilometers long) from March 1 to May 22, 1987 were tested and found to exhibit a mean loss of [* * *] dB/km at a wavelength of 1550 nanometers, with [* * *] fibers measured at [* * *] dB/km or lower. At 1300 na-

nometers, the mean loss was [* * *] dB/km.

SEI's production of nearly [* * *] S–3 pure fused silica core, fluorine-doped clad fibers (with an average length of 6 kilometers) from January 1 to May 31, 1987 showed a remarkably similar average loss of [* * *] dB/km at 1550 nanometers, with [* * *] fibers measured at [* * *] dB/km or lower. At 1300 nanometers, the average loss was [* * *] dB/km.

Insofar as mechanical strength is concerned, single-mode fibers with germania-doped cores and pure fused silica claddings have a higher intrinsic strength than single-mode fibers with pure fused silica cores and fluorine-doped claddings. In practice, however, intrinsic strength is not a factor because surface flaws in the glass impose the most important limitation on strength. These flaws result from processing of the fibers, not the materials from which they are made.

Sumitomo's claim that fibers with germania-doped cores are inferior to those with pure fused silica cores in the respect of susceptibility to degradation by hydrogen released by the synthetic polymer insulation in undersea cables is equally unconvincing. At the hydrogen levels experienced in undersea cables, attenuation losses resulting from hydrogen exposure would amount to a maximum of .03 dB/km over the 25–year life of the cable, and perhaps as low as .001 dB/km. Such losses are of no practical significance. Moreover, it is unclear whether the hydrogen effect is a function of the dopant used or whether it exists for any silica-based fiber.

The claimed susceptibility of germania-doped fibers to degradation by high-energy radiation likewise appears insignificant. There is no evidence that radiation is a problem in any applications with the possible exception of nuclear energy power plants or national defense installations.

It is interesting to note that a number of undersea optical cables presently in the planning stage are expected to be made with germania-doped optical waveguide fibers. There is no persuasive evidence of any advantages of pure fused silica core

fibers over germania-doped core fibers which are sufficiently significant to make them non-equivalent.

■ Sumitomo contends that claims 1 and 2 of the '915 patent must be construed to exclude germania-doped fibers because the inventors themselves have recognized that the patent does not contemplate dopants usable in amounts exceeding 15% by weight. Sumitomo points to column 3, lines 56–59 of the specification of the '915 patent in which it is stated:

To make certain that doped fused silica possesses optical and physical characteristics almost identical to those of pure fused silica, doping materials *should not exceed 15% by weight.* (Emphasis added).

This view was repeated by the inventors in their '550 patent specification at column 5, lines 47–49:

Heretofore known optical waveguides made of fused silica and doped fused silica had the inherent problem that dopants could not be added in excess of 15% by weight.

In a pre-trial deposition, Dr. Schultz admitted that the expression "known optical waveguides" referred to the structure of the '915 patent. Because, as the '550 patent discloses, a practical waveguide can be made with germania dopant in an amount exceeding 15% by weight, Sumitomo argues that the '915 patent claims cannot be interpreted to cover germania-doped fibers.

That argument is without merit. Claim 1 does not exclude any dopant which can be successfully used in concentrations above 15% by weight. It simply does not cover fibers containing such dopants unless they are present at a level below 15%.

■ Sumitomo further contends that Corning is estopped from asserting that claim 1 of the '915 patent is infringed by Sumitomo's S–3 fiber by the amendments which were made in the claim during prosecution of the patent application. Specifically, Sumitomo argues that claim 1 would not have been allowed if it had not been amended to require the addition of a dopant material "on at least an elemental basis" and in

"an effective amount up to 15 percent by weight." Even assuming that the claim would not have been allowed without these limitations, this does not create a prosecution history estoppel because it is not these limitations which prevent claim 1 from reading literally as the S–3 fiber. In the S–3 fiber, the fluorine dopant is added "on at least an elemental basis," and in "an effective amount up to 15 percent by weight."

What prevents claim 1 from literally reading on the S–3 fiber is the recitation that dopant material is added to the core to a degree in excess of that of the cladding layer. That limitation was not added by amendment but was present in the claim from the beginning.

As originally filed, claim 1 of the '915 application read:

An optical waveguide comprising

a cladding layer formed of a material selected from the group consisting of pure fused silica and doped fused silica, and

a core formed of fused silica doped to a degree in excess of that of the cladding layer so that the index of refraction thereof is of a value greater than the index of refraction of said cladding layer.

Where the amendments made in the claims do not involve the parts of the claims whose applicability to the accused device or process is in question, no prosecution history estoppel arises. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1363 (Fed.Cir.1983).

Sumitomo further contends that Corning is estopped from asserting that Claim 1 of the '915 patent is infringed by Sumitomo's S–3 fiber under the doctrine of equivalents by arguments made during prosecution of the application for the '915 patent. Specifically, Sumitomo points out that in seeking to distinguish the prior art Flam et al. patent, Corning's patent attorney made the following statement:

Therefore, *a doping material for purposes of increasing the index of refraction of the core* not only improves the

results of an optical waveguide produced in accordance with the teachings of this invention, *but is absolutely essential.* (emphasis Sumitomo's)

That contention is not persuasive. Clearly what the attorney was trying to say was that the '915 invention differed from Flam in that the '915 invention involves the addition of a "doping material" which becomes a permanent part of the glass, whereas Flam discloses irradiation of the glass by subatomic particles which do not remain in the glass but merely cause dislocations of atoms or molecules therein with resulting changes in its index of refraction. Because the specification of the '915 patent application specifically discusses only dopants which increase the refractive index of silica glass, it was natural for the attorney to speak in terms of the addition of doping materials "for purposes of increasing the index of refraction of the core." When the attorney gratuitously added that such addition is "absolutely essential," what he obviously meant to say was that unless the index of refraction of the core is greater than that of the cladding, the fiber cannot function as an optical waveguide. Since Flam did not disclose the addition of *any* doping material, it was not necessary for the attorney to distinguish the '915 invention on the basis that it involved the addition of a doping material which increases the refractive index of the core and such statement did not result in the allowance of claim 1.

Such statements must be viewed in the light of the art being considered. As the Court of Appeals for the Federal Circuit stated in *Mannesmann Demag Corp. v. Engineered Metal Prod.*, 793 F.2d 1279, 1284–85 (Fed.Cir.1986)

Determination of the scope of an estoppel deriving from actions taken before the Patent and Trademark Office requires review of not only the nature of such actions, but the reasons therefor: the prior art thereby distinguished, and the examiner's objections thereby overcome.

## CORNING'S '550 PATENT

Corning's '550 patent, entitled "Germania Containing Optical Waveguide," was issued May 20, 1975 on an application filed January 4, 1973 in the names of Drs. Robert D. Maurer and Peter C. Schultz. The patent contains eight claims; however, only claim 1 is asserted in this action.

### The '550 Invention

In the two years following the filing of the application which led to the '915 patent, Corning continued to experiment primarily with titania-doped fused silica optical waveguide fibers and began to develop such fibers for marketing. It was found that it was necessary to subject such fibers to heat treatment to reduce attenuation. But heat treatment lowered the mechanical strength of the fibers, and efforts were concentrated on developing a low-loss fiber which did not require heat treatment. These efforts were ultimately successful and Corning was able to make titania-doped optical waveguide fibers without heat treatment with a light loss as low as [* *] dB/km at a wavelength of [* * *] nanometers.

Under the direction of Drs. Maurer and Schultz, a research effort was undertaken to find an alternative dopant material with which even lower attenuation could be achieved. Experiments were conducted with a number of dopants, including germania. As noted previously, Dr. Schultz, in the late 1960s, had attempted to prepare a germania-doped fused silica glass in bulk but had not succeeded due to the volatilization of germania in the high temperature boule furnace he was then using.

However, in late 1971 and early 1972, D.L. Bachman and F.W. Voorhees, technicians working under the direction of Dr. Schultz, successfully produced by vapor deposition soots of both pure germania glass and germania-doped fused silica. By March 1972 such soots had been sintered (consolidated into clear glass preforms) and fibers had been drawn therefrom and tested. By mid–1972, a fiber with a germania-doped fused silica core had exhibited a light loss of only 4 dB/km. By the end of 1972, similar results were obtained with fibers

whose cores contained more than 15% by weight germania.

The use of germania as a dopant not only eliminated the need for the heat treatment step, but increased the amount of light transmitted over a kilometer from about 8% in the best titania-doped optical waveguide fibers theretofore used to approximately 40%.

*The '550 Patent, Its Disclosure, Its Prosecution and Its Acceptance*

The invention disclosed and claimed in the '550 patent is an optical waveguide fiber containing in excess of 15% by weight germania in its core. The patent specification summarizes the invention as follows:

> Briefly, according to this invention, an optical waveguide is produced comprising a cladding layer formed of relatively high purity glass and a core of high purity germania containing glass having a constant or gradient index of refraction above that of the cladding layer, said high purity germania containing glass having a cation impurity level not exceeding 10 parts per million of transition elements and a germania content in excess of 15 percent by weight.

Prior to the '550 invention by Drs. Maurer and Schulz, it was thought that the only glasses that could be used to make low-loss optical waveguide fibers had cores of fused silica containing only moderate amounts of dopant because it was believed that dopants, like contaminants, caused absorption and/or scattering of the transmitted light. However, Maurer and Schulz found that the use of germania in amounts in excess of 15% by weight permitted the production of optical waveguide fibers with a higher numerical aperture—*i.e.*, a wider angle of light acceptance. This made the light-emitting diode, or "LED," a viable alternative to the laser as a light source for optical communications in the mid–1970s when the high cost and questionable reliability of lasers made their use impractical.

After all the claims of the application for the '550 patent had been rejected by the Patent Examiner as unpatentable over a number of prior patents and publications disclosing germania-containing glasses, claim 1 was amended by adding a limitation specifying that the claimed optical fiber has a "light attenuation of less than about 100 dB/km at the utilization wavelength of light." The amendment was accompanied by an affidavit under Rule 132 signed by the co-inventor Dr. Schultz, stating that tests on the glasses disclosed in the references had shown that all of them had light attenuations substantially higher than 100 dB/km.

The examiner rejected the amended claim as drawn to new matter because the original specification did not support the 100 dB/km limitation. However, he suggested that the graph of Figure 5 supported an 80 dB/km limitation. The claim was accordingly amended to specify a "light attenuation of less than about 80 dB/km" and was thereupon allowed.

The invention claimed by the '550 patent has enjoyed substantial commercial success and has achieved exclusive commercial acceptance where an optical waveguide fiber with high numerical aperture is required. Corning's sales of optical waveguide fiber containing in excess of 15% by weight germania in the core have exceeded [* * *] kilometers.

The '550 patent has also been well respected. It was included in each of the consent judgments and license agreements discussed above in connection with the '915 patent.

*Affirmative Defenses of Sumitomo against the Corning '550 Patent*

■ U.K. patent 1,108,509 ("the U.K. '509 patent"), for "Improvements in and relating to Fibre–Optical Elements" published on April 3, 1968, is the only non-Corning prior art relied on by Sumitomo relative to the '550 patent. The U.K. '509 patent describes conventional fiber optics formed of germanate glasses, *i.e.*, multi-component glasses containing between 35% and 62% germania, together with numerous other materials. Such glasses are vastly different from the glasses of the '550 patent, in which germania is used only as a minor percentage dopant in fused silica.

Glasses of the type disclosed in the U.K. '509 patent were widely used in high-loss applications such as conventional fiber optics. They contained light-absorbing impurities which made them wholly unsuitable for optical waveguide use. Because of this, it was not expected that glasses containing germania in amounts in excess of 15% by weight were capable of transparency approaching that necessary for optical waveguide use.

The invention of the '550 patent was not obvious in view of the teachings of the U.K. '509 patent.

■ Sumitomo further contends that the '550 patent is invalid because neither the inventors nor anyone else at Corning had made and tested optical waveguide fibers conforming to certain of the examples given in the patent specification. Sumitomo stresses that no tests were conducted to determine the increase in attenuation of fibers of silica glasses doped with more than 15% germania when they are irradiated with neutron or gamma rays, even though the '550 patent specification asserts that these fibers are not affected by such radiation. That argument is without force. There is no legal requirement that all of the examples in the patent specification actually be reduced to practice before the filing of the application; it is only required that the specification contain a disclosure which enables those skilled in the art to practice the invention. Sumitomo does not contend that the specification of the '550 patent fails to contain such an enabling disclosure, nor that any statement in it would interfere with the successful practice of the invention.

■ Sumitomo further contends that the '550 patent is invalid because the limitation in claim 1 to a fiber having "light attenuation of less than about 80 dB/km at the utilization wavelength of light" is not critical. But there was no representation either in the patent or in the prosecution history that this limitation was critical. Indeed, the circumstances of its insertion into the claim—the claim first being amended to specify an attenuation of less than about 100 dB/km and then amended again at the suggestion of the examiner to call for 80 dB/km in order to satisfy the requirement of support in the specification—made it obvious that the 80 dB/km figure was not critical, but was chosen merely to contrast the prior art products, having attenuations far above that figure, with the waveguide fibers embodying the patented invention, having much lower losses.

The cases cited by Sumitomo in support of the proposition that false criticality is a basis for invalidation of the patent under 35 U.S.C. § 112 are inapplicable here, where the figure in question represents a performance rating—a measure of success—and not a prescription of a method or technique necessary to achieve it.

There is likewise no merit in Sumitomo's contention of invalidity or unenforceability of the '550 patent for false criticality based upon the 15% dopant limitation of claim 1. That limitation does not serve to distinguish any cited art. While Corning may have been entitled to a claim broadly covering low-loss fibers formed of high purity fused silica doped with germania, it believed that such a fiber containing no more than 15% by weight germania was already covered by the '915 patent and it saw no need for duplicate coverage. As previously pointed out, an applicant may always claim less than he is entitled to claim. *See, e.g., W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1556 (Fed.Cir.1983).

Sumitomo further contends that the '550 patent is invalid because the claims of Corning's Japanese application corresponding to the '915 patent, which was published more than one year prior to the filing of the '550 application, contained claims which did not include the 15% limitation on dopant materials. That contention is without merit.

A prior art patent (or published application) is a reference only for that which it teaches. As the Court of Appeals for the Federal Circuit stated in *In re Benno,* 768 F.2d 1340, 1346 (Fed.Cir.1985):

> The scope of a patent's claims determines what infringes the patent; it is no measure of what it discloses. A patent

discloses only that which it describes, whether specifically or in general terms, so as to convey intelligence to one capable of understanding.

*See also In re Rasmussen*, 650 F.2d 1212, 1214 (CCPA 1981) ("Disclosure is that which is taught, not that which is claimed.") If the law were otherwise, it would be impossible to obtain an improvement patent on an invention coming within the claims of a dominant prior patent.

The Japanese application does not *teach* the use of germania as a dopant, even though its claims are broad enough to cover germania-doped fibers. Indeed, the Japanese application teaches precisely what is taught in the U.S. '915 patent, which was disclosed to the Patent Office in the '550 specification.

*Infringement by Sumitomo's M–2 Optical Waveguide Fibers*

 Claim 1 of the '550 patent reads as follows:

1. An optical fiber comprising

a cladding layer formed of high purity glass, and

a core of high purity germania containing glass having an index of refraction above that of the cladding layer, said high purity germania containing glass having a cation impurity level not exceeding ten parts per million of transition elements and a germania content in excess of 15% by weight, said optical fiber having light attenuation of less than about 80 dB/km at the utilization wavelength or wavelengths of light.

As was well known to those skilled in the art at the time of filing the application for the '550 patent, the expression "transition elements" in claim 1 refers to 3d transition metal ions—*i.e.*, ions having electrons in the 3d energy state or shell. These ions were well known to be light absorbers in glass. 3d transition metal ions include ions such as vanadium, chromium, nickel, iron, copper, manganese and cobalt, as well as titanium $3+$.

Fiber M–2 made in Japan by SEI has a cladding of substantially pure fused silica, with a silica-based core containing approximately 19–20% by weight germania on av-erage and approximately 0.2–0.3% by weight phosphorus pentoxide. Fiber M–2 made in North Carolina by SERT has a cladding of substantially pure fused silica, with a silica-based core containing approximately 19–20% by weight germania on average.

Both types of M–2 fiber have a light attenuation of no more than about 6 dB/km at the transmission wavelength. This means that they must have a cation impurity level in their cores not exceeding ten parts per million of transition elements.

Both M–2 fibers thus come within the literal wording of claim 1 of the '550 patent.

Sumitomo contends that M–2 fiber does not infringe claim 1 of the '550 patent because in the file history of the Japanese counterpart of the '550 patent it was asserted that "there must be more than 15% by weight GeO₂ in the outer circumference of the core where GeO₂ content is the smallest." Both the M–2 fiber produced by SEI and that produced by SERT are graded-index fibers having no GeO₂ in the outer circumferential part of the core.

That contention is not persuasive. The arguments made by Corning during prosecution of the corresponding Japanese patent are not binding upon it in an action for infringement of the U.S. patent. There is nothing in the specification of the '550 patent or in the file history of the application therefor which requires limiting claim 1 beyond its literal wording, which is satisfied by a fiber in which the average germania content of the overall core exceeds 15%.

## CORNING'S '454 PATENT

Corning's '454 patent, entitled "Method of Making Optical Waveguides," issued January 20, 1976 on an application filed April 22, 1974 in the name of Dr. Robert D. DeLuca. It contains 18 claims; however, only claim 1 is asserted in this action.

*The '454 Invention*

Early in Corning's work on optical waveguide fibers, it had been recognized that fibers produced by flame hydrolysis meth-

ods contained water in the form of hydroxyl (OH) ions. It was also recognized that this residual water absorbed light at certain wavelengths used in optical communications and thereby increased the attenuation of the fiber at those wavelengths. Corning's goal was to produce a fiber containing substantially less than ten parts per million of hydroxyls and preferably less than one part per million. It was believed that reducing hydroxyl content below 10 parts per million would produce a waveguide with an attenuation of less than 10 dB/km over the entire wavelength range of 700–1100 nanometers, the desired operating band for communication at the time.

Several procedures had been tried at Corning for removing OH ions from optical fiber preforms, but these were not effective to reduce the hydroxyl content of the optical fibers to levels below ten parts per million. One such procedure was to consolidate the soot preform in a gradient furnace containing a dry, inert atmosphere. This approach produced some drying but still left unacceptable levels of residual water. Optical waveguide fibers made using this approach exhibited attenuations only as low as 30 dB/km at 950 nanometers, which was still unsatisfactory for long distance optical signal transmission. An alternative approach for removing water from soot preforms, which was developed at Corning prior to the invention of the '454 patent, was to consolidate the preform in a vacuum. This approach was more effective than a dry-atmosphere consolidation process, but was not economical. Further, the vacuum consolidation approach was effective only to reduce residual water content to slightly below 20 parts per million, and fiber attenuation to slightly below 20 dB/km.

Dr. DeLuca began work on optical waveguides at Corning in about April 1971. In late 1972 or early 1973, he decided to try dehydration of soot preforms by consolidating them in a chlorine-containing atmosphere. Dr. DeLuca introduced the preform into a furnace operating at a temperature sufficiently high to consolidate the predominantly silica soot while supplying to the furnace an atmosphere of 10% chlo-

rine and 90% helium. This produced what was deemed a "startling" result. His initial attempt, in January 1973, yielded a water level which was about two percent of the lowest attained previously in an optical waveguide fiber and constituted an actual reduction to practice of the invention of the '454 patent.

Dr. DeLuca discovered that this process had the additional unexpected advantage that smaller percentages of chlorine than he had anticipated were needed because of the excellent permeation of chlorine into the soot at the very high temperatures required for consolidating the predominantly silica soot.

*The '454 Patent and its Disclosure*

The objects of the invention of the '454 patent, as stated in the specification, are to provide an "effective and economical method of removing residual water from a flame hydrolysis-deposited glass soot preform during the consolidation process," and to "provide a method of forming water-free optical waveguides having extremely low concentrations of contaminants." The '454 patent specification states that these objectives are achieved by the consolidation of flame hydrolysis-produced preforms by a process in which:

> chlorine permeates the interstices of the soot preform during the consolidation thereof and replaces hydroxyl ions by chlorine ions, thereby resulting in a glass article that is substantially water-free.

It is of course essential to the successful practice of the method that the interstices of the preform be closed after dehydration is completed, in order to prevent rewetting. As the '454 patent specification teaches, silica has a great affinity for water, and water is readily absorbed by a soot preform prior to the consolidation process because of its extremely high porosity and permeability. However, after silica glass has been formed into an optical waveguide fiber, its inner portion is inaccessible to water, and the absorptive tendency of the glass is no longer detrimental to its functioning in a waveguide.

**1394**

The '454 patent specification teaches that the consolidation of glass soot depends upon the glass composition and can be completed in the range of 1250°C.–1700°C. for soots of high silica content. The specification further teaches that the amount of chlorine present in the consolidation atmosphere should be no more than is required to render the soot substantially water free, and that excessive amounts will increase optical attenuation, perhaps due to impurities present in commercial chlorine.

The '454 patent specification teaches that glasses containing less than 1 part per million of OH are produced by a process in which dehydration of the porous preform occurs simultaneously with the formation of a dense glass layer.

In all of Dr. DeLuca's work leading to the '454 invention, the chlorine-containing atmosphere was applied throughout consolidation—as he described it, "until the blank had completely consolidated to form a clear glass." His invention disclosure was based upon that concept.

When Corning's attorney was preparing the patent application, he specifically asked Dr. DeLuca whether a continuous flow of chlorine was necessary throughout the consolidation step. DeLuca answered affirmatively in a handwritten marginal note reading, "Yes, until the glass is consolidated." Therefore, in the patent specification the supply of chlorine during consolidation was presented as a necessary element of the patented process. Thus the prior Elmer patent was distinguished as teaching "separate chlorination and consolidation steps." And example 4, set forth in column 12 of the specification of the '454 patent was designed "to illustrate the advantage of employing chlorine during the consolidation process." Lines 50–59 of that column compare an optical fiber drawn from a preform that was first dehydrated in a chlorine-containing atmosphere and thereafter consolidated (exhibiting an attenuation of 100 dB/km at a wavelength of 950 nm) and a fiber that was drawn from a preform which was both dehydrated and consolidated in a chlorine-containing atmosphere (exhibiting

an attenuation of only about 10 dB/km at the same wavelength).

During prosecution of the application for the '454 patent, the Corning patent attorney stressed the differences between the "simultaneous" '454 process and prior art glass treatment processes, such as that of Bruning U.S. patent 3,850,602, which had been relied upon in rejecting all of the claims. He argued that "whereas it [Bruning] employs a three-step method of purifying quartz and forming a solid body, the claimed method results in the *simultaneous purification of the soot preform and the consolidation thereof into a solid glass article.*" (Emphasis supplied).

*The Art Relied Upon by Sumitomo*

(1) *The Elmer Patent*

Corning's Elmer U.S. patent 3,459,522 (the "Elmer patent") for a "Method of Treating a Porous High Silica Content Glass," was issued August 5, 1969, on an application filed July 8, 1963. The patent teaches a method of removing residual water from a porous, high-silica-content glass article using a flowing stream of a substantially dry chlorine-containing atmosphere at 600–1000°C., followed by consolidation in a dry, non-oxidizing atmosphere. The Elmer patent was cited and discussed at length in the specification of the '454 patent.

Elmer is not directed to the dehydration of optical waveguide preforms but rather to a technique for removing residual water from "96% silica" glass ("Vycor"). The production of Vycor glass does not involve the deposition of soot by flame hydrolysis, but by phase separation, leaching and consolidation of an alkali borosilicate glass. There are significant differences in microstructure between the soot preforms treated in accordance with the '454 patent and the porous glasses treated in the Elmer process.

The drying method of the '454 patent differs from that disclosed by Elmer in that the glass is subjected to a chlorine-containing atmosphere during the process of consolidation. Elmer teaches that consolidation in a chlorine-containing atmosphere is undesirable because it can cause excess chlorine retention in the consolidated glass

with possible splitting of the glass. Thus Elmer would lead experimenters away from the use of a chlorine-containing atmosphere during the consolidation process.

(2) *Japanese Patent 45-37311*

Like the Elmer patent, Japanese patent 45-37311 teaches the use of chlorine to dehydrate porous glass at low temperatures, followed by a separate consolidation step performed at high temperatures in a non-chlorine-containing atmosphere.

In view of this art, the effectiveness of the simultaneous dehydration and consolidation method of the '454 patent in reducing the OH level of optical waveguide preforms was unexpected and surprising.

*Other affirmative defenses*

■■■ Sumitomo contends that the '454 patent is invalid and unenforceable because Corning failed to disclose to the Patent Office that the inventor of the '454 patent did not consider it critical to maintain the chlorine-containing atmosphere throughout the entire period of consolidation to a clear glass and that constituted a failure to disclose material information. In the first place, this contention is in direct contradiction of another Sumitomo contention on the issue of infringement: that the inventor considered as a necessary feature of his process the maintenance of the chlorine-containing atmosphere until consolidation was completed. However, it was never represented to the Patent Office that a chlorine-containing atmosphere had to be used "throughout" consolidation, no art was distinguished on that basis, and there is no reason to believe that the examiner allowed the claims on that basis.

This defense is therefore without merit.

*Alleged Infringement of the '454 Patent by SERT*

■■■ Claim 1 of the '454 patent reads as follows:

1. In the method of forming a glass article comprising the steps of

depositing on a starting member a coating of flame hydrolysis-produced glass soot to form a soot preform,

consolidating said soot preform to form a dense glass layer free from particle boundaries, and

forming said dense glass layer into a desired shape, said consolidation step being characterized in that it comprises

heating said soot preform to a temperature within the consolidation temperature range for a time sufficient to cause said soot particles to fuse and form a dense glass layer, and *simultaneously*

subjecting said soot preform to a stream of a substantially dry, hydrogen-free, chlorine containing atmosphere that is substantially free from contaminants that would adversely affect the optical properties of said glass article, said chlorine permeating the interstices of said soot preform during the consolidation thereof and replacing hydroxyl ions by chlorine ions, thereby resulting in a glass article that is substantially water-free. (emphasis added).

*SERT's process for making preforms for M-2 and S-2 fibers*

SERT's August 1984 declaratory judgment complaint in this litigation alleged that initial production of optical waveguide fiber at its North Carolina facility was to "begin in the immediate future." However, production of preforms for fiber manufacture did not begin until March 1985.

Despite the fact that equipment for dehydration and consolidation of preforms was available in SERT's North Carolina facility in the fall of 1984, the selection of the process to be used was apparently delayed to await the decision by the International Trade Commission ("ITC") in a proceeding in which Corning charged that the dehydration and consolidation process used by Sumitomo in Japan infringed the '454 patent. When the ITC ruled that the Japanese process was an infringement, SERT adopted a modified process designed to avoid the '454 patent.

[* * *]

*SERT's Process for Making Preforms for S-3 Fibers*

[* * *]

However claim 1 of the '454 patent requires the provision of a *chlorine*-contain-

ing atmosphere and further requires that the chlorine permeate the interstices of the soot preform and replace the hydroxyl ions with *chlorine* ions. There is no evidence that [* * *] functions in a comparable manner.

SERT's methods of making M–2, S–2 and S–3 preforms have not employed the process described in or covered by claim 1 of the '454 patent. Consolidation has not been accomplished by heating the preform to a temperature within the consolidation temperature range for such high-silica articles, to cause the soot to fuse into dense glass while "simultaneously" subjecting the soot preform to a stream of substantially dry, chlorine-containing atmosphere free from contaminants, to cause the chlorine to permeate the interstices of the preform and replace the hydroxyl ions with chlorine ions.

Corning's argument respecting infringement of the '454 patent is principally directed to establishing that the language of claim 1 which requires that dehydration and consolidation occur "simultaneously" is satisfied if the two overlap and does not require that dehydration continue *throughout* consolidation. Even assuming *arguendo* the validity of that contention, Corning has nevertheless failed to prove infringement of claim 1 by SERT. At the very least, the claim requires a significant overlap between the dehydration and consolidation steps. In [* * *].

Claim 1 could not be interpreted to cover such processes without losing its distinctiveness from the prior art cited against it during prosecution.

### CORNING'S OPTICAL WAVEGUIDE FIBERS AND PRODUCTION METHODS

At present, six main types of optical waveguide fibers are in commercial production at Corning—two single-mode fibers (types 1521 and 1528) and four multimode graded-index fibers (types 1517, 1519, 1508 and 1509).

The cores of Corning's types 1521 and 1528 single-mode optical waveguide fiber are comprised of approximately 8–9% and 10% by weight germania, respectively, with the remainder fused silica; their claddings are pure fused silica. Corning's type 1517 multimode graded-index optical waveguide fiber core contains approximately 10% germania by overall weight, and about 0.75% by weight phosphorus pentoxide, with the remainder fused silica; its cladding is pure fused silica. Corning's type 1521, 1528 and 1517 optical waveguide fibers thus contain each of the elements of claims 1 and 2 of the '915 patent.

Corning's type 1504, 1515, 1516 and 1518 multimode graded-index optical waveguide fibers previously manufactured by Corning had pure fused silica claddings and silica-based cores containing dopant in an amount less than approximately 15% by overall weight.

Each of these fibers thus contained all of the elements of claim 1 of the '915 patent.

Corning's types 1508, 1509 and 1519 multimode graded-index optical waveguide fibers have fused silica cores doped with germania in an amount exceeding 15% by overall weight. The cores of types 1508 and 1519 also contain less than 1% by weight phosphorus pentoxide. The claddings of all three are pure fused silica. The attenuation of each is less than 15dB/km at the transmission wavelength. These fibers thus contain each of the elements of claim 1 of the '550 patent.

Type 1505 commercial multimode graded-index optical waveguide fiber, previously manufactured at Corning's Wilmington facility, had a cladding layer formed of high purity glass and a core of high purity glass containing germania in excess of 15% by weight. It had a light attenuation of less than about 10 dB/km at the transmission wavelength. It thus included all of the elements of claim 1 of the '550 patent.

Corning currently utilizes the outside vapor deposition ("OVD") method in the manufacture of its commercial optical waveguide fibers. For the production of types 1517, 1519 and 1508 multimode graded-index fiber, a stream of reactant gas, selected to yield the desired final fiber composition, is fed into a natural gas-oxygen burn-

er, generating a stream of glass soot, which is directed toward a rotating and traversing bait. As soot builds up on the bait, the composition of the reactant gas stream is changed appropriately over time to vary radially the refractive index of the ultimate fiber. After completion of soot deposition, the bait is removed. The resulting soot preform is then passed into a [* *] furnace with a chlorine-containing gas flow. There, the preform is dehydrated during the process of consolidation to form a clear, consolidated glass preform which is later drawn into optical waveguide fiber.

In the production of type 1509 multimode graded-index fiber, [* * *] the soot preform is dehydrated during the process of consolidation, to form a clear consolidated glass preform for drawing into optical waveguide fiber.

In the production of single-mode fiber, Corning utilizes the same production steps as for type 1509 multimode fiber but with different reactant gas vapors during deposition. [* * *]

The method of forming Corning's OVD preforms into clear glass articles thus utilizes each of the steps of claim 1 of the '454 patent.

## COMMERCIAL SUCCESS

There are two major end use applications for which optical waveguide fiber is sold. One is for long-distance telecommunications involving the connection of terminals in a telephone network that are 3–50 kilometers apart, typically for public system use. The other is for local connection between terminals a few hundred meters to a few kilometers apart, typically for private network use.

In each of these two major optical waveguide fiber end use applications, optical waveguide fiber has had to compete with communications technologies that existed before optical waveguide fiber became available. In the long-distance public system application, optical waveguide fiber has successfully competed with and taken market share from satellite systems, microwave systems, cable systems and copper wire. In the local network application, optical waveguide fiber has competed with and taken market share from coaxial cables and both regular and specialized telephone wiring.

All single-mode fiber sold today has a core containing less than 15% dopant material by weight and is within the scope of the '915 patent. All multimode fiber that has a numerical aperture of about 0.24 or less contains up to 15% dopant in the core and is within the scope of the '915 patent. All multimode fiber with a numerical aperture greater than about 0.24 contains in excess of 15% dopant in the core and is within the scope of the '550 patent.

The two classes of optical waveguide fiber—those having a numerical aperture less than or equal to 0.24 and those having a numerical aperture greater than 0.24—are typically applied to different end use applications. The high numerical aperture products are typically used in the short-distance private network applications while the lower numerical aperture products are used in the long-distance public system applications.

Corning's commercial sales of optical waveguide fiber have grown dramatically from less than 4,000 kilometers in 1978, when Corning started commercial pilot plant production, to more than [* * *] kilometers in 1986. Of Corning's 1986 sales, over [* * *] kilometers were of fibers within the scope of the '915 patent. Over [* *] kilometers of Corning's 1986 sales were of multimode fiber within the scope of the '550 patent.

For the entire period 1978 to 1986, Corning's sales of fibers within the scope of the '915 patent exceeded [* * *] kilometers. Over that same period, Corning's total sales of multimode fiber within the scope of the '550 patent exceeded [* * *] kilometers.

Total United States sales of optical waveguide fiber have grown to over $400,000,000 in 1986. Of these sales, approximately 85 to 90 percent were of fibers within the scope of the '915 patent, while the remaining 10–15% were of multimode fibers within the scope of the '550 patent.

Worldwide annual sales of optical waveguide fiber reached approximately $600,000,000 in 1986. Of these sales, 65 to 70 percent were of fibers within the scope of the '915 patent, with the balance being fibers within the scope of the '550 patent.

## GENERALLY APPLICABLE LEGAL PRINCIPLES AND CONCLUSIONS OF LAW

*Patent Validity*

By statute, the patents in suit are presumed valid, and Sumitomo has the burden of establishing their invalidity by clear and convincing evidence. 35 U.S.C. § 282. This presumption of validity remains intact throughout the trial, and is not weakened or destroyed, even by the introduction of prior art which was not considered during the prosecution of the applications for the patents in suit. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed.Cir.1986). *ACS Hosp. Systems, Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1574–75 (Fed.Cir.1984).

Although Sumitomo introduced prior art which was not cited during the prosecution of the applications for the patents in suit, that art was no more pertinent than the art that was cited and considered by the Patent Office. Thus, Sumitomo failed to carry its burden of overcoming the deference accorded to the expertise of the Patent Office. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve*, 796 F.2d 443, 447 (Fed.Cir.1986).

Sumitomo has not established that each and every element of any of the patent claims in suit was disclosed by a single prior art patent or publication, as would be required for an anticipation which would invalidate the claim under 35 U.S.C. § 102. *Akzo N.V. v. U.S. Intern. Trade Com'n*, 808 F.2d 1471, 1479 (Fed.Cir.1986).

Sumitomo further failed to carry its burden of proving by clear and convincing evidence that any of the inventions covered by the claims in suit, viewed as a whole, would have been obvious to a person having ordinary skill in the art at the time the invention was made. *Panduit Corp. v.*

*Dennison Manufacturing Co.*, 810 F.2d 1561, 1568 (Fed.Cir.1987). In resolving the issue of obviousness, the scope and content of the prior art, the level of ordinary skill in the art and the differences between the claimed invention and the prior art must first be determined. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 35–36, 86 S.Ct. 684, 694, 702–03, 15 L.Ed.2d 545 (1966). This determination must of course be made as of the time the invention was made. *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894 (Fed.Cir.1984).

This means that the tendency to resort to hindsight must be avoided. The prior art must be examined on the basis of what it taught the art prior to the invention and cannot be reconstructed in light of what any of the Corning patents themselves teach. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1138 (Fed.Cir.1985); *Shackelton v. J. Kaufman Iron Works, Inc.*, 689 F.2d 334, 340 n. 4 (2 Cir.1982).

Other objective indicia of non-obviousness, such as a long-felt need for the invention, unsuccessful attempts by others, commercial success of the invention, adoption by the infringer of the invention and respect accorded the invention by the industry in the form of licenses and consent judgments must always be considered before a legal conclusion under 35 U.S.C. § 103 can be made. *Simmons Fastener Corp. v. Illinois Tool Works*, 739 F.2d 1573, 1575 (Fed.Cir.1984); *Jones v. Hardy*, 727 F.2d 1524, 1530–31 (Fed.Cir.1984); *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1555 (Fed.Cir.1983). Such considerations, when present, provide strong and persuasive evidence of non-obviousness. *United States v. Adams*, 383 U.S. 39, 52, 86 S.Ct. 708, 714–15, 15 L.Ed.2d 572 (1966); *Medtronic Inc. v. Daig Corp.*, 789 F.2d 903, 905 (Fed.Cir.1986); *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 895 (Fed.Cir.1984). Praise for the invention, including awards accorded to the inventors for their invention, are further evidence of the novelty and worth of the inventions. *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed.Cir.1984).

Here, the validity of the Corning patents is confirmed by the presence and strength of all these objective criteria of non-obviousness. There was a widely-expressed desire for a glass fiber capable of long-distance telecommunications use to replace copper cables with their recognized disadvantages, and there was an intensive international effort to provide such a fiber. After years of unsuccessful search, when industry experts had all but despaired of reaching the goal, Corning had an unexpected "breakthrough" which was immediately recognized as the long-sought solution and enthusiastically acclaimed. It literally created a new industry of substantial size. The Corning patents have been respected by competitors, with the exception of Sumitomo. Not one of the usual "signposts" of patentability is missing here, and they all point unmistakably in the direction of validity. Each of the claims in suit is valid as against Sumitomo.

Sumitomo failed to prove inequitable conduct by Corning or the patentees by the required clear, unequivocal, and convincing evidence. *Kimberly–Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed. Cir.1984). Each of the claims in suit is enforceable against Sumitomo.

### Patent Infringement

In determining infringement, the first resort is always to the patent claims themselves. If the accused matter falls within the wording of the claims, there is literal infringement. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir. 1984); *Smith Intern., Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1579 n. 2 (Fed.Cir.1983). But even if an accused device or process does not fall literally within the claims, infringement is made out if the accused device or process is equivalent to the claimed invention. An accused device or process is equivalent to the claimed invention if it performs substantially the same function in substantially the same way to obtain the same result. *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 731 F.2d 840, 847 (Fed.Cir.1984); *Hughes Aircraft*

*Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983); *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1579 (Fed.Cir.1983).

Every patent is entitled to a certain range of equivalents. Pioneer patents, like the '915 patent, are entitled to liberal construction and a broad range of equivalents. *Eibel Co. v. Paper Co.*, 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523 (1923).

Achieving the necessary differential in refractive index by doping the cladding with a substance, such as fluorine, which decreases its refractive index, instead of doping the core with a substance, such as germania, which increases its refractive index, constitutes a mere transposition of the elements of claim 1 of the '915 patent. Infringement is not avoided by a mere reversal or transposition of parts or components, or a mere change in form without a change in function. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482–83 (Fed.Cir.1984); *Carman Industries, Inc. v. Wahl*, 724 F.2d 932, 942 (Fed. Cir.1983). This rule would apply even if, or perhaps particularly if, it was unknown when the '915 invention was made that doping silica glass with fluorine would reduce its refractive index. *American Hosp. Supply Corp. v. Travenol Lab.*, 745 F.2d 1, 9 (Fed.Cir.1984); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1365 (Fed. Cir.1983); *Technical Tape Corp. v. Minnesota Mining & Mfg. Co.*, 247 F.2d 343, 350 (2d Cir.1957).

As previously noted, two of Sumitomo's optical waveguide fibers, M–1 and S–1, have germania-doped silica cores, containing less than 15% by weight germania, and substantially pure fused silica claddings. Claim 1 of the '915 patent covers an optical waveguide fiber with a core of fused silica doped with up to 15% by weight of at least an elemental material which will increase its index of refraction. Germania is such a material. Although germania is not among the doping materials listed in the specification of the '915 patent, the wording of claim 1 is clearly broad enough to cover fibers with fused silica cores doped with up to 15% germania. Sumitomo's fiber types

M–1 and S–1 therefore literally infringe claim 1 of the '915 patent.

Sumitomo's S–2 optical waveguide fiber has a fused silica core doped with approximately 5% by weight germania with a cladding of fused silica doped with approximately 0.2% fluorine. Claim 1 covers an optical waveguide fiber having a cladding either of pure fused silica or fused silica to which has been added at least an elemental dopant material and a core to which at least an elemental dopant material has been added to a degree in excess of the dopant material of the cladding, but not more than 15% by overall weight of the core. Claim 1 thus expressly contemplates the possible addition of a dopant to the cladding and is literally infringed by Sumitomo's S–2 fiber.

Sumitomo's S–3 optical waveguide fiber has a substantially pure fused silica core with a cladding of fused silica doped with fluorine to decrease its refractive index. This fiber performs substantially the same function in substantially the same way to achieve the same result as the optical waveguide fiber literally described in claim 1 of the '915 patent. There is no prosecution history estoppel which prevents interpreting claim 1 to cover the S–3 fiber. The two limitations which were added to the claim during prosecution of the application—the "elemental" requirement and the 15% dopant maximum—are both fully satisfied by the S–3 fiber.

Sumitomo's M–1 and S–1 optical waveguide fibers have a cladding of substantially pure fused silica, and thus literally infringe claim 2 of the '915 patent as well. Sumitomo's S–3 optical waveguide fiber does not infringe claim 2. The only limitation which distinguishes the dependent claim 2 from the predicate claim 1 is the requirement of a pure fused silica cladding. Disregarding this limitation in claim 2 would make its scope identical to that of claim 1 and violate a fundamental rule of claim construction. *Interdent Corp. v. United States*, 187 U.S.P.Q. 523, 527 (Ct. Cls.1975).

As previously noted, the M–2 fibers made by both SEI and SERT have a cladding of substantially pure fused silica, with a silica-based core containing in excess of 15 percent by weight germania (along with 0.2–0.3% by weight phosphorus pentoxide) to produce a fiber with an index of refraction greater in the core than in the cladding and with a light attenuation well below 80 dB/km. Both M–2 optical waveguide fibers therefore literally infringe claim 1 of the '550 patent.

As also previously discussed, in all of the processes which have been used by SERT in the commercial production of [* * *]. Thus there has been no literal infringement of claim 1 of the '454 patent. Nor has there been any infringement of claim 1 under the doctrine of equivalents. Both in the specification of the '454 patent and during the prosecution of the application therefor, the prior art was distinguished on the basis that it taught separate drying and consolidation steps, whereas the claimed invention involved simultaneously performing these steps. Without this limitation, claim 1 surely would not have been allowed. The limitation therefore may not now be disregarded. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870–71 (Fed.Cir. 1985).

Claim 1 of the '454 patent has not been infringed by any process used to date by SERT.

*Sumitomo's Willful Infringement of the '915 and '550 Patents*

■ Willfulness of infringement is a question of fact to be determined by looking at the "totality of the circumstances." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1580 (Fed.Cir. 1986); *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed. Cir.1983); *Underwater Devices Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1389–90 (Fed.Cir.1983).

On April 15, 1984, the Federal Court of Canada ruled that Corning's Canadian patents Nos. 951,555 and 981,078, respectively corresponding to the U.S. '915 and '550 patents were valid and that Canadian patent 951,555 had been infringed by Sumitomo's optical waveguide fibers. Although Sumitomo was dropped as a party to that

action, it paid the litigation costs of the remaining defendant, its customer, Canada Wire & Cable, pursuant to an indemnification agreement.

Claim 1 of Canadian patent 951,555 is identical to Claim 1 of the U.S. '915 patent except that the Canadian claim does not contain the two limitations which were added during prosecution of the U.S. '915 patent: the requirement that the dopant be added "on at least an elemental basis" and the limitation of the dopant material to 15% by weight of the core. Essentially the same prior art (except for the U.K. '101 patent) and the same defenses were relied on as are asserted here, and were found insufficient to invalidate the patent or avoid a ruling of infringement.

And, in the proceeding previously mentioned, the ITC ruled that the '915 patent was valid and had been infringed by Sumitomo's M–1, S–1, S–2 and S–3 optical waveguide fibers. That decision was rendered January 22, 1985, after a lengthy evidentiary hearing in which Sumitomo raised essentially the same prior art (including the U.K. '101 patent) and the same defenses it has asserted in this action.

Corning had brought that proceeding under 19 U.S.C. § 1337 to stop importation of these Japanese-made infringing fibers into the United States. Although the Administrative Law Judge ("ALJ") found both the '915 and '454 patents valid and infringed, he found no violation of § 1337, which requires a further finding of an "effect or tendency" of the importation "to destroy or substantially injure a domestic industry." Because at that time the demand for optical waveguide fibers was greater than could be supplied by Corning's then existing production facilities, the ALJ could not find the necessary injury to a domestic industry. His decision was affirmed by the full ITC and by the Court of Appeals for the Federal Circuit, which considered only the economic injury issue. *Corning Glass Works v. U.S. International Trade Com'n*, 799 F.2d 1559, 1562, 1572 (Fed.Cir. 1986). The Court of Appeals for the Federal Circuit vacated the decision of the ITC on the patent issues as "mooted by affirmance on the grounds of no injury."

While neither the vacated ITC decision nor the Canadian decision is binding here, and this Court does not rely on either in reaching its decision as to validity and infringement of the U.S. patents in suit, it is believed appropriate to consider those decisions in ruling on Corning's contention that Sumitomo's infringement of the '915 patent has been willful.

There is no evidence that Sumitomo made any effort to change the composition of its optical waveguide fibers to avoid Corning's '915 patent after the ITC and Canadian court decisions. Sumitomo's contentions that the '915 patent does not cover either fibers with germania-doped cores or fibers with pure fused silica cores and fluorine-doped claddings are definitely not frivolous and this Court could not find that the infringement of the '915 patent was willful prior to these decisions of the Canadian court and the ITC. However, after the latter decision on January 22, 1985, this Court could scarcely find otherwise. Every contention which Sumitomo makes here was carefully considered and rejected. To proceed thereafter to manufacture and sell the same fibers without changes designed to avoid infringement can only be construed as outright defiance or baseless optimism.

That Sumitomo felt compelled so to proceed in the face of those rulings is an eloquent testimonial to the commercial importance of the patented invention. The Court concludes that Sumitomo's infringement of the '915 patent has been willful at least since January 22, 1985.

## SUMMARY

Because of Sumitomo's infringement of claims 1 and 2 of the '915 patent and claim 1 of the '550 patent, the infringement being willful with respect to the '915 patent, Corning is entitled to an injunction against continued infringement, to recover appropriately increased damages, to be determined by the Court following a separate

trial, and to an award of its attorney's fees. 35 U.S.C. §§ 283, 284, 285.

SO ORDERED.